UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
DANIEL MADERA,

                      Plaintiff,

                - against -

COMMISSIONER OF SOCIAL SECURITY,

                      Defendant.
---------------------------------------------------------x

**MEMORANDUM & ORDER**
20-CV-1459 (PKC)

PAMELA K. CHEN, United States District Judge:

Plaintiff Daniel Madera brings this action under 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration's ("SSA") denial of his claim for Disability Insurance Benefits ("DIB") on February 21, 2019. The parties have cross-moved for judgment on the pleadings. (Dkts. 10, 13.) For the reasons set forth below, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's motion. The case is remanded for further proceedings consistent with this Memorandum and Order.

**BACKGROUND**

**I.    Procedural History**

On March 23, 2017, Plaintiff applied for DIB, claiming that he had been disabled since October 14, 2014 due to bipolar disorder, post-traumatic stress disorder ("PTSD"), and a torn bicep. (Tr.[1] 57–58, 162–64, 184.) The claim was initially denied on May 11, 2017. (Tr. 68.) Plaintiff then requested a hearing before an administrative law judge. (Tr. 73–75.) On January

---

[1] All references to "Tr." refer to the consecutively paginated Administrative Transcript. (Dkt. 9.)

24, 2019, Plaintiff appeared with his then-attorney Charles Weiser[2] for a hearing before administrative law judge Michael D. Burrichter (the "ALJ"). (Tr. 29–56.) During the hearing, vocational expert Janice Hastert testified by telephone. (Tr. 32, 50.) By decision dated February 21, 2019, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act (the "Act") from October 14, 2014, his alleged onset date, through the date of the ALJ's decision. (Tr. 12–24.) Plaintiff's request for a review of the ALJ's decision was denied by the Appeals Council on March 5, 2020. (Tr. 1–3.) Thereafter, Plaintiff timely commenced this action.[3]

## II.     The ALJ's Decision

In evaluating disability claims, the ALJ must adhere to a five-step inquiry. The plaintiff bears the burden of proof at the first four steps of the inquiry; the Commissioner bears the burden at the final step. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citation omitted). First,

---

[2] Although the transcript for the January 24, 2019 hearing reflects that Plaintiff was represented by attorney Charles Weiser at that time (Tr. 29), the ALJ's February 21, 2019 decision states that Plaintiff is represented by Harold Skovronsky (Tr. 12), who remains his attorney in this matter presently before the Court.

[3] According to Title 42, United States Code, Section 405(g),

[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow.

42 U.S.C. § 405(g). "Under the applicable regulations, the mailing of the final decision is presumed received five days after it is dated unless the claimant makes a reasonable showing to the contrary." *Kesoglides v. Comm'r of Soc. Sec.*, No. 13-CV-4724 (PKC), 2015 WL 1439862, at *3 (E.D.N.Y. Mar. 27, 2015) (citing 20 C.F.R. §§ 404.981, 422.210(c)). Applying this standard, the Court determines that Plaintiff received the Commissioner's final decision on March 10, 2020 (*i.e.*, five days after Plaintiff's request to appeal the ALJ's decision was denied on March 5, 2020) and that Plaintiff's filing of the instant action on March 19, 2020—nine days later—was timely. (*See* Complaint, Dkt. 1.)

2

the ALJ determines whether the plaintiff is currently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the answer is yes, the plaintiff is not disabled. *Id.* If the answer is no, the ALJ proceeds to the second step to determine whether the plaintiff suffers from a severe impairment. *Id.* § 404.1520(a)(4)(ii). An impairment is severe when it "significantly limit[s] [the plaintiff's] physical or mental ability to do basic work activities." *Id.* § 404.1522(a). If the plaintiff does not suffer from an impairment or combination of impairments that is severe, then the plaintiff is not disabled. *Id.* § 404.1520(a)(4)(ii). But if the plaintiff does suffer from an impairment or combination of impairments that is severe, then the ALJ proceeds to the third step and considers whether it meets or medically equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). *Id.* § 404.1520(a)(4)(iii); *see also id.* pt. 404, subpt. P, app. 1. If the ALJ determines at step three that the plaintiff has one of the listed impairments, then the ALJ will find that the plaintiff is disabled under the Act. *Id.* § 404.1520(a)(4)(iii). On the other hand, if the plaintiff does not have a listed impairment, the ALJ must determine the plaintiff's residual functional capacity ("RFC") before continuing to steps four and five. To determine the plaintiff's RFC, the ALJ must consider the plaintiff's "impairment(s), and any related symptoms, [that] may cause physical and mental limitations that affect what [the plaintiff] can do in a work setting." *Id.* § 404.1545(a)(1). The ALJ will then use the RFC finding in step four to determine if the plaintiff can perform past relevant work. *Id.* § 404.1520(a)(4)(iv). If the answer is yes, the plaintiff is not disabled. *Id.* Otherwise, the ALJ will proceed to step five and determine whether the plaintiff, given their RFC, age, education, and work experience, has the capacity to perform other substantial gainful work in the national economy. *Id.* § 404.1520(a)(4)(v). If the answer is yes, the claimant is not disabled; otherwise, the claimant is disabled and is entitled to benefits. *Id.*

Here, at step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since October 14, 2014. (Tr. 14.) At step two, the ALJ determined that Plaintiff had "the following severe impairments: history of right bicep tendon rupture status-post surgical repair, keratoconus[4] of the right eye, obesity, bipolar disorder, and post-traumatic stress disorder (PTSD)." (*Id.*) The ALJ found Plaintiff's diagnosis of astigmatism of the left eye to be "non-severe." (Tr. 15.) At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal any of the listed impairments in the Listings. (*Id.*) The ALJ then determined Plaintiff's RFC as follows:

> [T]he claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b), except the claimant can lift and carry up to twenty pounds occasionally and lift or carry up to ten pounds frequently; stand and/or walk for six hours out of an eight-hour work day; and sit for six hours out of an eight-hour workday. The claimant can occasionally climb ladders, ropes and scaffolds. The claimant can frequently [reach] overhead and in all other directions with the right upper extremity. The claimant can occasionally work at unprotected heights or with moving mechanical parts. The claimant is limited to occupations requiring only occasional near, far and peripheral acuity and depth perception and no fine visual acuity on the right, but can avoid ordinary hazards in the workplace, for example boxes on the floor, open doors, etc. The claimant is able to understand, remember, and carry out simple, routine and repetitive tasks in a work environment with no fast-paced production requirements involving only simple work-related decisions, and with only occasional judgment and work place changes. The claimant can occasionally respond to and have interaction with supervisors, coworkers, and the general public.

(Tr. 17.) Then, at step four, the ALJ concluded that due to his severe impairments, Plaintiff could not perform his past work as a wall plasterer. (Tr. 23.) Finally, at step five, the ALJ found that there were other jobs Plaintiff could perform, such as inserting machine operator, collator operator,

---

[4] "Keratoconus" is an eye disease that causes the thinning of the cornea and irregularities of the cornea's surface, resulting in loss of vision. *See Keratoconus*, JOHNS HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/conditions-and-diseases/keratoconus (last visited Sept. 28, 2021).

4

and linking machine operator. (Tr. 23–24.) The ALJ thus concluded that the Plaintiff was not disabled. (Tr. 24.)

## STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of benefits. 42 U.S.C. § 405(g). In reviewing a final decision of the Commissioner, the Court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera*, 697 F.3d at 151 (citations omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (alterations and internal quotation marks omitted) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In determining whether the Commissioner's findings were based on substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (citation omitted). However, "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013) (per curiam).

## DISCUSSION

Plaintiff contends that the ALJ's decision is not supported by substantial evidence and fails to apply the relevant legal standards. (Plaintiff's Motion for Judgment on the Pleadings ("Pl.'s Mot."), Dkt. 10-1, at 8.) For the reasons set forth below, the Court grants Plaintiff's motion and

remands for the ALJ to develop the evidentiary record regarding Plaintiff's mental impairments and to explain his credibility determination, including his reliance on evidence of daily functioning. *See Fontanez v. Colvin*, No. 16-CV-1300 (PKC), 2017 WL 4334127, at *13 (E.D.N.Y. Sept. 28, 2017) ("In addition to its authority to affirm, modify, or reverse a final decision, the Court may remand the case for the ALJ to further develop the record, resolve conflicts and ambiguities, or elucidate his or her rationale.").[5]

### I. The ALJ's Failure to Develop the Record on Plaintiff's Mental Impairments

"The ALJ's failure to develop the record is a threshold issue, because the Court cannot rule on whether the ALJ's decision regarding [Plaintiff's] functional capacity was supported by substantial evidence if the determination was based on an incomplete record." *Craig v. Comm'r*

---

[5] Though immaterial to the resolution of the parties' motions, the Court rejects Plaintiff's assertion that the ALJ improperly relied on the opinion of the State Agency evaluator, Dr. Eric Selsner. (*See* Pl.'s Mot., Dkt. 10-1, at 10.) First, Plaintiff's argument that Dr. Selsner is not a credentialed doctor and has no mental health expertise is simply incorrect. (*See* Defendant's Cross-Motion for Judgment on the Pleadings, Dkt. 13-1, at 17–18.) Although Dr. Selsner does not identify himself as a "psychologist" in his assessment, the medical specialty code "38" that appears next to Dr. Selsner's signature (*see* Tr. 61, 64, 65, 67) indicates that he is, in fact, is a psychologist. *See* Program Operations Manual System DI 24501.004 Medical Specialty Codes, https://secure.ssa.gov/apps10/poms.nsf/lnx/0424501004 (last visited Sept. 28, 2021) (listing medical specialty code "38" as "Psychology"). Second, it was not improper for the ALJ to treat Dr. Selsner as an acceptable medical source and give partial weight to his opinion. Although Dr. Selsner did not examine Plaintiff, and instead based his opinion purely on his review of the records in Plaintiff's file (Tr. 57–66), the ALJ explained that he found Dr. Selsner's opinion regarding Plaintiff's "moderate social limitations" to be "consistent with [Plaintiff's] abnormal mood and affect and his work history, which includes conflicts with coworkers" (Tr. 21–22). As a general matter, "[a]n ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability." *Wilkins v. Comm'r of Soc. Sec.*, No. 18-CV-67 (JGW), 2019 WL 2500500, at *6 (W.D.N.Y. June 17, 2019) (quoting *Baszto v. Astrue*, 700 F. Supp. 2d 242, 249 (N.D.N.Y. 2010)). Third, in according partial weight to Dr. Selsner's opinion, the ALJ did not "override" the opinions of treating or examining sources, as Plaintiff did not provide any such opinions. *See Alexander P. v. Comm'r of Soc. Sec.*, No. 19-CV-1361 (CJS), 2021 WL 821838, at *4 (W.D.N.Y. Mar. 4, 2021) ("Provided the opinion of a non-examining source is supported by evidence in the record and is consistent with the applicable regulations, the opinion of the non-examining source may override the opinions of treating or examining sources.").

6

*of Soc. Sec.*, 218 F. Supp. 3d 249, 267 (S.D.N.Y. 2016) (quotation marks and citation omitted); *accord Alvarez v. Comm'r of Soc. Sec.*, No. 14-CV-3542 (MKB), 2015 WL 5657389, at *14 (E.D.N.Y. Sept. 23, 2015).  It is well-established in the Second Circuit that an ALJ presiding over a social security hearing must "affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508–09 (2d Cir. 2009)).  This obligation exists "even where, as here, the claimant is represented by counsel." *Merriman v. Comm'r of Soc. Sec.*, No. 14-CV-3510 (PGG) (HBP), 2015 WL 5472934, at *18 (S.D.N.Y. Sept. 17, 2015) (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)).

Here, the key deficiency in the record relates to the opinion of psychological consultative examiner Dr. Toula Georgiou, who, in his April 28, 2017 psychiatric evaluation of Plaintiff, following a face-to-face examination, offered the following assessment:

> [Plaintiff] may have difficulties regulating his emotions, sustaining an ordinary routine and schedule, performing tasks at a consistent pace, having to interact with others in a work setting due to psychiatric reasons.  The results of the present evaluation appear to be consistent with psychiatric difficulties and this may significantly interfere with [Plaintiff's] ability to function on a daily basis.

(Tr. 306.)  The ALJ ascribed "partial weight" to Dr. Georgiou's opinion, explaining that "[w]hile this opinion was rendered after an examination and the medical record does show severe impairments that limit, the opinion that [Plaintiff] 'may' have difficulties is vague and not a specific, functional limitation." (Tr. 22.)  The ALJ further explained that, among other things, "such restrictions are not entirely consistent with medical record[s] including the most recent psychiatric medical record in December 2018 that note improvement in mood." (*Id.*)

The Court finds that the evidence the ALJ received regarding the impact of Plaintiff's mental illness on his ability to function in the workplace was not so consistent as to relieve the

7

ALJ of his obligation to resolve any ambiguity in the record created by Dr. Georgiou's "vague" opinion. Plaintiff's recent psychiatric records, including those referenced by the ALJ as "not entirely consistent" with Dr. Georgiou's assessment of Plaintiff (Tr. 22), raise questions about Plaintiff's mental status and RFC. For example, on August 28, 2018, though Plaintiff "reported improvement in his mood symptoms," he also reported "going through multiple stressors" that "at times exacerbate[d] his symptoms," prompting his treating physician to increase Plaintiff's daily Seroquel[6] dosage "to optimize mood stabilization." (Tr. 656.) Then, on November 17, 2018, Plaintiff reported "depressed mood, anhedonia, lack of energy and concentration," and his treating physician "[a]dded carbamazepine[7] 200 mg twice daily to [Plaintiff's] regimen to optimize mood stabilization." (Tr. 672.) Approximately one month later, on December 20, 2018, though Plaintiff experienced "improvement in his mood" and "described his mood as being more leveled," his treating physician "increased carbamazepine to 600 mg daily to optimize mood stabilization." (Tr. 681.) That Plaintiff reported a more level mood in December 2018, after the daily dosage of his medication was increased and a second medication aimed at mood stabilization was introduced, does not present an inconsistency with Dr. Georgiou's assessment, or justify the ALJ's failure to clarify Dr. Georgiou's opinion that Plaintiff "may," among other things, have difficulty regulating his emotions and interacting with others at work. Rather, the objective evidence in Plaintiff's medical records, *i.e.*, increased use of mood stabilizers, is evidence that Plaintiff still struggled to stabilize his mood.

---

[6] Seroquel is used to treat bipolar disorder, major depression, and schizophrenia. *See Seroquel*, RX LIST, https://www.rxlist.com/seroquel-drug.htm (last visited Sept. 28, 2021).

[7] Carbamazepine (brand name Tegretol) is used to treat the symptoms of, among other things, bipolar mania. *See Tegretol*, RX LIST, https://www.rxlist.com/tegretol-drug.htm (last visited Sept. 28, 2021).

In addition, Plaintiff's older psychiatric records present evidence, subjective and objective, that are seemingly "consistent with psychiatric difficulties" that, as Dr. Georgiou found, "may significantly interfere with [Plaintiff's] ability to function on a daily basis." (Tr. 306.) Several years after a car accident in which Plaintiff reported that his mother died in his arms, Plaintiff was treated in a psychiatric hospital for two weeks in 2009, then sent to outpatient transitional services for two months, and hospitalized again for a day in January 2010 because his wife was "seeing the signs" of mania. (Tr. 225.) In November 2015, Plaintiff received a psychiatric assessment by Dr. Yasmin Nazia when he presented for a medication refill after his "regular psychiatrist refused to take his insurance." (Tr. 247–48.) During that assessment, Plaintiff reported that his symptoms began after his mother died, and included auditory hallucinations and persecutory delusions, such as thinking that his life was in danger and trying to hide from people, as well as irritability and "feeling very energetic." (Tr. 248.) Plaintiff reported feeling very overwhelmed due to his job status—he "got into [an] argument with another co-worker which became physical and [Plaintiff] was fired"—and frequently cried during the evaluation. (*Id.*) Plaintiff was diagnosed with "Bipolar disorder with psychotic features, psychosis in remission," and prescribed weekly psychotherapy and 200 mg of Seroquel. (Tr. 250–52.)

During follow up sessions over the next year, Plaintiff's diagnosis and treatment remained consistent, and he reported that he generally felt better with medication. (Tr. 263 (Dec. 2015, "feeling more normal" and "able to deal with the stress in a better way"); Tr. 265 (Jan. 2016, "improvement in his mood" and denied "increased energy or racing thoughts"); Tr. 268 (Mar. 2016, "doing relatively well" and denied "any depressive, manic, anxiety, or psychotic symptoms"); Tr. 271 (Apr. 2016, same); Tr. 274 (May 2016, similar); Tr. 277 (Aug. 2016, same); Tr. 281 (Sept. 2016, similar); Tr. 283 (Oct. 2016, same); Tr. 286 (Nov. 2016, same); Tr. 289 (Dec.

9

2016, similar); Tr. 293 (Jan. 2017, similar).  In February 2017, Plaintiff reported feeling a "little sad" due to problems with his "ex-company," but otherwise denied "any depressive, manic, anxiety[,] or psychotic symptoms" and his mood was observed to be "euthymic."[8]  (Tr. 296–97.)  However, on April 3, 2017, Plaintiff's behavior and mood were described as "anxious" and Plaintiff reported that he "had r[u]n out [of his medication] and he had not been able to sleep without it," so he was given a "7-day prescription" and advised follow up with his treating physician Dr. Nazia.  (Tr. 299–300.)  On April 10, 2017, Plaintiff returned to the hospital where he denied "changes in mood, sleep and appetite" and denied "symptoms consistent with depression, mania, psychosis and anxiety."  (Tr. 301.)  His behavior and mood were described as "normal."  (Tr. 301–02.)

More than two weeks later, on April 28, 2017, Plaintiff presented for his psychiatric evaluation by Dr. Georgiou, where, in reporting on his "current functioning," he described difficulty sleeping; decreased appetite; depressive symptoms, such as crying spells, social withdrawal, and difficulty concentrating; and anxiety-related symptoms, such as irritability, nightmares, and flashbacks.  (Tr. 304.)  Plaintiff recounted that in 2001 or 2000, he was in a car accident and his mother died at the scene, and then the following year, his father passed away.  (*Id.*)  Plaintiff also explained his manic symptoms as becoming "more talkative," "disorganized speech," "flight of ideas, distracted, and agitated."  (Tr. 304–05.)  Dr. Georgiou described Plaintiff's affect as "[a]nxious" and his mood as "[d]ysthymic[9] and tearful."  (Tr. 305.)

---

[8] Euthymic describes a stable mental state or mood for those affected with bipolar disorder that is neither manic nor depressive.  *See Euthymic*, MERRIAM-WEBSTER, https://www.merriam-webster.com/medical/euthymia (last visited Sept. 28, 2021).

[9] Dysthymic describes a chronic mildly depressed or irritable mood often accompanied by other symptoms, *e.g.*, eating and sleep disturbances, fatigue, and poor self-esteem.  *See Dysthymic*,

Although in the two months immediately following his evaluation with Dr. Georgiou, Plaintiff generally denied symptoms of depression, mania, anxiety, or psychosis, as well as disturbances in sleep and appetite (Tr. 522, 530), on July 11, 2017, Plaintiff "[c]ontinue[d] to report intermittent 'bouts of anxiety,'" and that, without medication, he "start[ed] having racing thoughts, mostly about the incidents at his work place which led to him being fired." (Tr. 547.) Plaintiff also "became tearful" describing "several stressors such as losing his house and financial problems." (*Id.*) On August 1, 2017, Plaintiff reported "stable good mood" and that his medication was helping him "better control his impulse[s]," but that he was "still going through multiple stressors" and "experience[d] depressive symptoms." (Tr. 552.) On August 21, 2017, Plaintiff reported that he was "doing well," was "not depressed" and denied "feeling anxious" or having any "ongoing major stressor in his life." (Tr. 558.) But a few weeks later, on September 5, 2017, Plaintiff reported that he "still experienc[ed] depressive symptoms," including "depressed mood, excessive sense of guilt, feeling hopeless, worthless and helpless." (Tr. 563.) In response, his treating physician increased his Seroquel prescription from 200 to 300 mg. (Tr. 562–64.)

Taken together, Plaintiffs' medical records present a picture of someone who, despite denying symptoms at times, has nonetheless reported intermittent feelings of anxiety and depression for at least the last six years, which his physicians have observed and treated by altering and increasing his medications. Notably, none of the treating physicians referenced in Plaintiff's medical records offered a medical source opinion in this matter nor did they specifically opine, as did Dr. Georgiou, about Plaintiffs' ability to function in a workplace.

---

MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/dysthymic (last visited Sept. 28, 2021).

11

"The duty to develop the record is particularly important where an applicant alleges he is suffering from a mental illness, due to the difficulty in determining whether these individuals will be able to adapt to the demands or stress of the workplace." *Merriman*, 2015 WL 5472934, at *19 (internal quotation marks, alterations, and citation omitted); *see Alvarez*, 2015 WL 5657389, at *18 (finding that the ALJ's "duty to develop the record . . . is heightened because Plaintiff claims that she is disabled by a mental impairment." (citations omitted)). Here, the ALJ was presented with what he identified as a "vague" opinion by Dr. Georgiou that was "not a specific, functional limitation" (Tr. 22), along with a lengthy history of psychiatric instability. "[I]t is the ALJ's duty to develop the record and *resolve any known ambiguities*, and that duty is enhanced when the disability in question is a psychiatric impairment." *Camilo v. Comm'r of the Soc. Sec. Admin.*, No. 11-CV-1345 (DAB) (MHD), 2013 WL 5692435, at *22 (S.D.N.Y. Oct. 2, 2013) (emphasis added) (citations omitted). Although Dr. Georgiou was a consultative examiner and not a treating physician, the Court nonetheless finds that given the ALJ's own identification of Dr. Georgiou's opinion as "vague," and the fact that Dr. Georgiou's opinion is not wholly contradicted by, or inconsistent with, Plaintiff's medical records, the ALJ should have sought clarification from Dr. Georgiou before rendering his decision as to Plaintiff's RFC. *See Merriman*, 2015 WL 5472934, at *19 ("If the ALJ was dissatisfied with [the treating physician's] failure to provide a medical opinion after his single examination of the plaintiff because of the gap created in the record, he had an affirmative duty to further develop the record with regard to plaintiff's limitations and their effect on plaintiff's ability to work before according [the treating physician's] opinion only some weight" (citations omitted)); *Camilo*, 2013 WL 5692435, at *22 ("The fact that [the ALJ] herself recognized the need to supplement the record with additional materials from [the treating

12

physician] . . . shows that this supplemental material was needed in order to make a reliable determination as to disability.").

Moreover, to fulfil the duty of developing the record, the ALJ must not only "obtain a claimant's medical records[10] and reports but also [] question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Craig*, 218 F. Supp. 3d at 261 (citation omitted). Here, the ALJ failed to probe or consider how Plaintiff's mental impairments impacted his RFC.[11] The ALJ asked Plaintiff what was limiting or preventing him "from functioning and working" since October 14, 2014, and Plaintiff responded that, among other things, "[i]t's very difficult for me to continue to stay on one thing because I get emotional and it doesn't work. . . . It's difficult for me to get it." (Tr. 40.) The ALJ then confirmed Plaintiff's diagnosis of bipolar disorder and PTSD and asked Plaintiff about his treatment and medication. (Tr. 40–41.) Plaintiff explained that he did "talk therapy" every two or three weeks, which "took a lot out of [him]," and that he took medication in the evening that "helps [him] sleep to get out of [his] mind, to take a pause." (*Id.*) Beyond obtaining this information, which was readily discernible from the medical records, the ALJ asked no further questions about how Plaintiff's bipolar disorder, PTSD, and any related symptomatology, might impact his ability to function in the workplace. Plaintiff's counsel, Mr. Weiser, jumped in and

---

[10] During the hearing, Plaintiff's then-attorney, Mr. Weiser, affirmed that he did not have any objection to the records in the file, nor was he aware of any outstanding medical records or additional evidence that should be submitted. (Tr. 33–34.)

[11] By contrast, the ALJ asked Plaintiff questions to determine the impact, if any, of his "physical issues," including an injury to Plaintiff's right arm and vision impairment due to keratoconus in the right eye and astigmatism in the left eye, on Plaintiff's RFC. (Tr. 41–43). The ALJ thereby fulfilled his duty with respect to Plaintiff's physical issues by following a line of questions that targeted the "impact of [Plaintiff]'s [physical] impairments on [his] functional capacity." *See Craig*, 218 F. Supp. 3d at 261. The same cannot be said for questions about Plaintiff's mental impairments.

asked Plaintiff to explain why he was terminated from his previous job, to which Plaintiff responded:

> I was having problems with supervisors, arguing and getting in disagreements. And it would go back and forth for different supervisors that I would say I know they have a problem with me. I know I felt I wasn't being heard. I also had a few manias that happened during work that kind of scared off people.

(Tr. 46.) Plaintiff elaborated on his "manias," explaining:

> If somebody takes me, if I get too emotional, too angry, too sad, I would go somewhere in my head. And it would take me a little while or somebody to tell me that, Danny, you have to stop. And these manias that could go on, I've walked miles in a development in Brooklyn in circles and I didn't know.

(*Id.*) Plaintiff further testified that he gets manias "two, three times a week" and, when he can "feel it coming on" he needs to "immediately . . . find [his] wife" or somebody "who [he] know[s] has [his] back" because "[i]t's just very difficult." (Tr. 47.) Plaintiff explained that he believed his manias would be "worse" at work because he is triggered by "[i]nteraction[s] with other people, other minds, other attitudes, anything." (*Id.*) Moreover, Plaintiff explained that his PTSD caused him to "get ugly angry," which contributed to "what was going on at [his] job" and why "eventually they fired [him]." (Tr. 48.) Following this testimony, the ALJ asked no follow up questions "about any subjective complaints and the impact of [Plaintiff]'s [diagnosed and treated mental] impairments on [his] functional capacity." *Craig*, 218 F. Supp. 3d at 261 (citation omitted).

In sum, the Court finds that the ALJ's failure to resolve ambiguities and fully develop the record with respect to the impact of Plaintiff's mental impairments on his ability to work—and specifically his ability to interact with others—warrants vacating the ALJ's decision and remanding the case for further proceedings. *See Moran*, 569 F.3d at 114–15 (vacating the ALJ's decision "not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision");

*Alvarez*, 2015 WL 5657389, at \*14 ("An ALJ's 'failure to develop the record adequately is an independent ground for vacating the ALJ's decision and remanding the case.'" (citation omitted)). On remand, the ALJ should question Dr. Georgiou or obtain a supplemental opinion from him to clarify the functional limitation finding that the ALJ found to be "vague."  Moreover, the ALJ should specifically question Plaintiff about how his mental impairments, including his "manias," may impact his ability to interact with others and function in the workplace.

## II.   The ALJ's Insufficient Credibility Determination and Explanation

Plaintiff argues that the ALJ improperly relied upon evidence of Plaintiff's ability to engage in activities of daily living to determine that Plaintiff is in fact capable of working.  (*See* Pl.'s Mot., Dkt. 10-1, at 12–13.)  The Commissioner argues that the ALJ was obligated to consider Plaintiff's daily activities in his evaluation of the overall record, that to do so was not an error, and that the record "shows that Plaintiff's daily activities were not as minimal as he now contends." (Defendant's Cross-Motion for Judgment on the Pleadings, Dkt. 13-1, at 25–27.)

Here, the ALJ made several findings with respect to Plaintiff's "daily activities" in determining Plaintiff's RFC.  *See* 20 C.F.R. § 404.1529(c)(3)(i) (identifying daily activities as a factor to be considered in evaluating the intensity and persistence of a claimant's symptoms); *Craig*, 218 F. Supp. 3d at 264 (explaining that "a claimant's daily activities" may be considered as evidence because "an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone" (citation omitted)). First, the ALJ noted that Plaintiff's "work history" after the alleged onset date is "inconsistent with disabling mental impairment" because in May 2016, Plaintiff reported working for his wife; in January 2017, April 2018, and October 2018, Plaintiff reported working in construction; and in September 2017, Plaintiff reported working part-time for low pay.  (Tr. 20.)  However, the ALJ failed to explain how these passing references to work, taken from Plaintiff's medical records—

15

with no detail about the nature of the tasks performed or the extent to which Plaintiff interacted with others—supports an RFC determination that Plaintiff "can occasionally respond to and have interaction with supervisors, coworkers, and the general public." (Tr. 17.)  The ALJ did not ask Plaintiff about these odd jobs to determine whether they might reveal relevant information about Plaintiff's RFC considering his mental illness.  The potential significance of this information is borne out by the ALJ giving only partial weight to Dr. Georgiou's "vague" opinion—*i.e.*, that Plaintiff "may have difficulties regulating his emotions, sustaining an ordinary routine and schedule, performing tasks at a consistent pace, [and] having to interact with others in a work setting" (Tr. 306)—because the ALJ found that these restrictions are "not consistent with the testimony of [Plaintiff] that he is married, drives, goes to the store with his wife and/or family 4-5 times a week, and is able to use the Internet for research and Google" (Tr. 22).  To the extent the ALJ considered Plaintiff's statements about his daily activities in determining his RFC, it was also necessary to complete the record with Plaintiff's statements about the reasons for his intermittent and extremely brief periods of work—which, on their face, are consistent with his testimony about not being able to get along with co-workers, Dr. Georgiou's opinion about Plaintiff's possible difficulties sustaining a regular work routine and interacting with others in a workplace, and Plaintiff's overall medical record.  Furthermore, the ALJ failed to explain how Plaintiff's marriage, shopping with family members, using Google, or any of these other activities are inconsistent with Dr. Georgiou's opinion or supportive of the ALJ's RFC finding.

Similarly, the ALJ identified the following "wide-range of activities of daily living" that he found to be "inconsistent with disabling mental impairment," including Plaintiff "mowing his small lawn, gardening, and performing some basic household chores," "driv[ing] a few times a week including taking his daughter to school and his wife to work," "visiting the store a few times

16

a week" (though noting Plaintiff preferred to do so "with others"), performing "personal care independently" and "small household repairs," using "a computer to access the internet," and using "the train to travel." (Tr. 20–21.) Ultimately, though, the ALJ failed to explain how these activities—most of which are solitary tasks performed in the comfort of Plaintiff's own home or with trusted family members—support the conclusion that Plaintiff "can occasionally respond to and have interaction with supervisors, coworkers, and the general public." (Tr. 17.)

As discussed, the need for such explanation is particularly important here because of the other non-medical evidence documenting Plaintiff's difficulty interacting with others, which led to workplace conflict and Plaintiff getting fired. For example, Plaintiff explained in his April 14, 2017 function report that he does not "have much patience at times" and is "not as social" as he was before his illness because he "feel[s] people are always looking at [him] waiting for [him] to be upset." (Tr. 180.) Plaintiff also indicated that he had problems getting along with people in authority and "ha[s] cursed and got fired [be]cause [he] couldn't control [him]self." (Tr. 182.) Plaintiff's wife attested to these same interpersonal conflicts in an April 10, 2017 function report, explaining that Plaintiff's illness limits his ability to work because "[h]e is very difficult to be around. Very agitated[,] irritable, lo[ses] focus, [gets] distracted. Sometimes he feel[s] godly like he has special powers to get things done. Talks too much. [G]ets himself in trouble." (Tr. 165.) She also reported that Plaintiff "no longer can hangout [sic] [because] he is very vulgar with his words," that "people don't care to be around a trouble maker," and that Plaintiff "hates" authority figures and got fired because he "cursed [and] made a very big sc[ene] [and] even threatened his supervisor." (Tr. 170–71.) Although the ALJ assigned "partial weight" to the wife's report, he noted that her statement was based only "upon casual observation, rather than objective medical

17

examination and testing" and that it did "not outweigh the accumulated medical evidence regarding the extent to which [Plaintiff]'s impairments limit [his] functional abilities." (Tr. 22.)

The ALJ acknowledged Plaintiff's reports of how mental disturbances impact his ability to work, noting "[Plaintiff] reported his mood swings are triggered by interact[ions] with others. He reportedly experienced a mania at work and argued with supervisors. He also stated he previously dissociated at work, and he complains of anger outbursts associated with PTSD. . . . Finally, he reported a physical altercation with a coworker [that] resulted in his termination from work." (Tr. 19.) Nevertheless, as with his findings regarding daily activities, the ALJ did not specifically explain why he disregarded these reports by Plaintiff. Instead, the ALJ offered a general explanation that Plaintiff's "allegations are not fully consistent with the evidence" and that although Plaintiff's "assertions related to his inability to function due to mental deficits have been considered," they were "not given great weight because the medical record does not support his allegations." (Tr. 21.)

However, it is precisely this approach to assessing a claimant's credibility with respect to his own statements about his limitations that courts routinely reject as improper. *See Henningsen v. Comm'r of Soc. Sec. Admin.*, 111 F. Supp. 3d 250, 269 (E.D.N.Y. 2015) ("Courts in this district have repeatedly found remand to be appropriate based on an ALJ's use of this shorthand credibility determination because . . . the SSA regulations provide that the ALJ must assess the claimant's credibility *before* evaluating the RFC." (internal quotation marks omitted)) (collecting cases); s*ee also Otero v. Colvin*, No. 12-CV-4757 (JG), 2013 WL 1148769, at *7 (E.D.N.Y. Mar. 19, 2013) ("[I]t makes little sense to decide on a claimant's RFC prior to assessing her credibility. It merely compounds the error to then use that RFC to conclude that a claimant's subjective complaints are unworthy of belief."). It is not sufficient for the ALJ to merely find that a plaintiff's statements

regarding their symptoms and limitations are "not entirely consistent with the medical evidence," rather, the ALJ should make a "specific credibility determination, explain[ing] how [he or] she balanced the various factors [including the claimant's daily activities], and identify any inconsistencies between the plaintiff's testimony and the rest of the record."[12] *Calo v. Comm'r of Soc. Sec.*, No. 20-CV-3559 (AMD), 2021 WL 3617478, at *4–5 (E.D.N.Y. Aug. 16, 2021); *Smith v. Comm'r of Soc. Sec.*, No. 19-CV-5361 (AMD), 2021 WL 1163113, at *6 (E.D.N.Y. Mar. 26, 2021) ("The ALJ should explain why the plaintiff's testimony is inconsistent with the record, and 'must include specific reasons' for the credibility finding." (citation omitted)); *Kane v. Astrue*, 942 F. Supp. 2d 301, 314 (E.D.N.Y. 2013) (finding, *inter alia*, that the ALJ did not "specify how Plaintiff's contentions of pain are inconsistent with the medical evidence" and concluding that "[t]he ALJ's lack of specificity and failure to meet Social Security Administration requirements for evaluating the credibility of Plaintiff's subjective complaints require remand"). "Credibility determinations must contain *specific reasons* for the finding on credibility, supported by the evidence in the case record, and must be *sufficiently specific* to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and *the reasons* for that weight." *Woodcock v. Comm'r of Soc. Sec.*, 287 F. Supp. 3d 175, 176 (E.D.N.Y.

---

[12] The factors to be considered in assessing a claimant's credibility are:

(1) the claimant's daily activities, (2) the duration, location, frequency and intensity of the claimant's pain, (3) precipitating and aggravating factors, (4) the type, dosage, effectiveness, and side effects of any medications that the claimant takes, (5) any treatment, other than medication, that the claimant has received, (6) any other measures that the claimant employs to relieve the pain, and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain.

*Calo v. Comm'r of Soc. Sec.*, No. 20-CV-3559 (AMD), 2021 WL 3617478, at *4 (E.D.N.Y. Aug. 16, 2021) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii)).

2017) (emphasis added) (alteration, quotation marks, and citation omitted) (remanding with direction to the ALJ to, among other things, "articulate all of her reasons" for concluding that the plaintiff is not credible). Where, as here, "the ALJ determines that [Plaintiff's] allegations are not supported by objective medical evidence, the ALJ must engage in a credibility inquiry." *Smith*, 2021 WL 1163113, at *6 (internal quotation marks and citation omitted).

Thus, on remand, the ALJ should "include a specific credibility determination, explain how [he] balanced the various factors [including Plaintiff's daily activities], and identify any inconsistencies between the plaintiff's testimony and the rest of the record." *Hodge v. Comm'r of Soc. Sec.*, No. 20-CV-769 (AMD), 2020 WL 7262846, at *4 (E.D.N.Y. Dec. 10, 2020) (citation omitted); *see also Calo*, 2021 WL 3617478, at *5; *Woodcock*, 287 F. Supp. 3d at 176; *Kane*, 942 F. Supp. 2d at 314.

## CONCLUSION

For the reasons set forth herein, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion. The Commissioner's decision is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Memorandum and Order. The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 30, 2021
       Brooklyn, New York